**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| v. | : | |
| | : | **NO. 20-362** |
| **MARK CHAMBERLAIN** | : | |

**Goldberg, J.**                                                        **February 11, 2022**

<u>**MEMORANDUM OPINION**</u>

Following a warrant-based search of his home in Philadelphia, Pennsylvania, Defendant Mark Chamberlain was charged with felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), and possession of a firearm not registered in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d).  Defendant moves to suppress all physical evidence seized from this search and any statements he made during the ensuing arrest, alleging that the search warrant was not supported by probable cause.  For the following reasons, I will deny the Motion.

**I.      FACTUAL BACKGROUND**

**A.   <u>The Search Warrant Affidavit</u>**

On April 22, 2019, Philadelphia Police Officer Timothy Bogan prepared an affidavit of probable cause in support of a search warrant for 2139 Anchor Street, Philadelphia, Pennsylvania.  The affidavit included the following representations:

- On Monday, April 14, 2019, Philadelphia Police Officers from the Criminal Intelligence Unit passed on to other law enforcement personnel information regarding a black male named "Ron" selling drugs using a cell phone number of 215-609-7495 around the area of Anchor and Torresdale Avenue, which was the scene of a recent homicide occurring on April 11, 2019.

- On April 16, 2019, Police Officers Galazka, Brown, Sumter, Eleazer, Sgt. Love, and Lt. Muldoon went to the area of Anchor and Torresdale Avenues.

- On the same date, Police Officers Bogan and DeVeaux met with a confidential informant who they searched for illegal contraband with negative results.

- Officer Bogan dialed the cell phone number 215-609-7495, which was answered by a male's voice. The phone was turned over to the confidential informant who spoke to the male. According to the affidavit, "[t]here was a one sided conversation and the location of 5400 Torresdale Ave was picked out, and the phone call was ended."

- Officer Bogan gave the confidential informant $40, and the informant exited the officer's vehicle. A Nissan Quest, operated by a black male, arrived at the location, and the informant entered the vehicle for approximately one minute. Back up officers followed the Nissan Quest as it left, and the informant got back into Officer Bogan's car and turned over two clear Ziploc packets containing crack/cocaine.

- The Nissan Quest, followed by several backup officers, parked in the area of Anchor and Tulip Street. As the officers circled the block and returned, they found the vehicle was unoccupied. Officer Galazka determined that the vehicle was registered to a Mark Chamberlain at 1235 South 58th Street in Philadelphia.

- The next day, April 17, 2019, Officers Bogan and DeVeaux went to the area of 1200 S 58th Street to look for the Nissan Quest, but it was not on location. They returned on April 18, 2019, but could not locate the vehicle.

- Also on April 18, 2019, Officer Bogan again dialed the number of 215-609-7495. A male voice answered, and Officer Bogan turned the call over to the confidential informant who had a one-sided conversation. Officer Bogan gave the informant $40 and took him to 5400 Torresdale Avenue on foot. After five minutes, a black male wearing all black with his hood up walked onto the 2100 block of Sanger. The male made a hand motion to the informant, and the informant approached the male and handed him the $40. In turn, the male handed the informant an item in a hand to hand exchange. The male then walked northbound onto 2100 Carver Street with Officer Deveaux following on foot.

- The confidential information returned to Officer Bogan's vehicle and turned over two loose chunks of crack/cocaine. Officer Bogan remained in contact with Officer Deveaux during this whole time.

- Officer Bogan then observed the black male walking on Anchor Street and watched him use his keys to open up the front door of a property located at 2139 Anchor Street.

- Officer Bogan picked up Officer DeVeaux and the two officers observed the Nissan Quest parked in front of 2139 Anchor Street.

(ECF No. 20-1.)

2

Based on this affidavit, the police officers obtained a search warrant for 2139 Anchor Street, Philadelphia, Pennsylvania, and a search of that location occurred on April 22, 2019.

### B. Other Relevant Facts

A suppression hearing was held on January 6, 2022, during which both Officer Jeffrey Galazka and Defendant Mark Chamberlain testified.

According to Officer Galazka's testimony, prior to the execution of the search warrant, the officers conducted another surveillance of the 2139 Anchor Street location.  (N.T. 1/6/22, 34:4–8.)  Officer Galazka observed Defendant exit the property at 2139 Anchor Street for a short period of time and then return to that property.[1]  (Id. at 34:13–15.)  Officer Galazka notified back-up officers that Defendant had returned to the property, and then, at approximately 4:30 p.m., knocked on the door of 2139 Anchor Street and announced, "police, search warrant."  (Id. at 34:24–35:1.)  The officers heard footsteps becoming fainter, as if someone was running towards the back of the property, and the officers made a decision to breach the door and enter the house.  (Id. at 35:2–11, 40:10–12.)

When Officer Galazaka entered the property, Defendant was taking his last few steps towards the rear of the property.  The officer recalled that there was a female and about four or five children.  (Id. at 42:24–43:5.)  Officer Galazaka again announced, "police, search warrant, police search warrant."  (Id. at 35:13–15.)  Defendant turned around and put his hands up, at which time Officer Galazaka observed a heavy object hanging from Defendant's hooded sweatshirt.  The officer grabbed the object, said "gun", and recovered a gun from his hooded sweatshirt.  (Id. at 35:13–19.)  The officers secured the gun and placed it in an evidence bag, and then handcuffed Defendant.  (Id.

---

[1]     Defense counsel acknowledged that, during this surveillance and prior to execution of the search warrant, another controlled drug buy was conducted.  (N.T. 1/5/22, 29:1–5.)  None of the witnesses at the hearing, however, testified regarding the details of this third controlled buy.  (Id.

at 36:24–37:1.)  Officer Galazaka testified that he did not ask Defendant any questions about the gun or anything found in the house, and he did not hear or observe any other officers ask Defendant about the gun or anything found in the house.  (Id. at 37:5–15.)  No one yelled anything at Defendant other than, "police, search warrant" or "let me see your hands."  (Id. at 37:16–24.)

According to Officer Galazka, Defendant then told the officers that he had gotten the gun for his own safety.  (Id. at 37:2–4.)  Defendant further volunteered that "I was a witness in a murder. I was down at homicide, I have this, and I got another gun down in the basement in the rafters."  (Id. at 38:2–4.)  No one asked Defendant any further questions, and Officer Galazka went down to the basement and recovered a sawed-off shotgun.  (Id. at 38:5–11.)  Officer Galazka secured the shotgun and continued his search.  (Id. at 38:15–17.)  He testified that he never asked Defendant any questions about the guns, any drugs, or anything else found in the house, and he never observed any other officers asking such questions.  (Id. at 39:11–18.)

Following Officer Galazka's testimony at the suppression hearing, Defendant offered his own version of the circumstances of the April 22, 2019 search of 2139 Anchor Street.  Defendant explained that he, his fiancée, and their five children were all at the property that day.  (Id. at 48:12–20.)  Three of the children were in the living room and two were upstairs.  (Id. at 49:7–10.) Defendant stated that, when police entered the property, they asked him "where's the stuff at, tell us where the stuff is at," and Officer Galazka stated that he would be calling the Department of Human Services to come and get the kids if Defendant did not volunteer "where it was at."  (Id. at 50:5–13.)  Officer Galazka affirmatively denied making any such statements or hearing any other officer do so.  (Id. at 43:25–44:12.)

On October 15, 2020, the Government filed an indictment charging Defendant with felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) and possession of a

firearm not registered in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d).

## II.      STANDARD OF REVIEW

When reviewing a magistrate judge's determination of probable cause to issue a warrant, a district court should "[pay] great deference" to the magistrate's decision.  Illinois v. Gates, 462 U.S. 213, 236 (1983).  This standard means that "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."  United States v. Ventresca, 380 U.S. 102, 109 (1965).  If a substantial basis exists to support the probable cause finding, the court must uphold that finding even if it or a "different magistrate judge might have found the affidavit insufficient to support a warrant."  United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993) (quoting United States v. Jones, 994 F.2d 1051, 1057 (3d Cir. 1993)).

Such deference, however, "does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions."  United States v. Tehfe, 722 F.2d 1114, 1117 (3d Cir. 1983).  Rather, the duty of the reviewing court is to "ensure that the state district justice had a 'substantial basis' for concluding that the affidavit supporting the warrant established probable cause."  United States v. Mortimer, 387 F. App'x 138, 140 (3d Cir. 2005) (citing Jones, 994 F.2d at 1054); see also Conley, 4 F.3d at 1205 ("Keeping in mind that the task of the issuing magistrate is simply to determine whether there is a fair probability that contraband or evidence of a crime will be found in a particular place, a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found.") (internal quotation marks omitted).

## III.     DISCUSSION

Defendant moves to suppress all physical evidence obtained from his residence and any statement he made following arrest.  With respect to the physical evidence, Defendant argues that (1) the search warrant did not establish that evidence of the alleged crime would be found in 2139

Anchor Street, and (2) the good faith exception does not apply.  In a supplement to his Motion to Suppress, Defendant alternatively argues that the affidavit contained false and misleading information upon which the Magistrate Judge had to rely in order to approve the search warrant. With respect to Defendant's statement made following the arrest, Defendant contends that the statement must be suppressed as involuntary and as the fruit of an unlawful search.

### A.  Whether the Search Warrant Was Supported by Probable Cause

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV.  For a search to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause.  See United States v. Burton, 288 F.3d 91, 102 (3d Cir. 2002) (citing Payton v. New York, 445 U.S. 573, 586 (1980)).

In reviewing a magistrate's probable cause determination, the United States Court of Appeals for the Third Circuit has directed that a district court must "confine[] itself to the facts that were before the magistrate judge, i.e., the affidavit, and . . . not consider information from other portions of the record." United States v. Mortimer, 387 F. App'x 138, 140 (3d Cir. 2005).  A finding of probable cause does not require direct evidence "linking the place to be searched to the crime." United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (quoting Conley, 4 F.3d at 1207).  Rather, when basing a probable cause determination on a police affidavit, the judge must "read the entire affidavit in a 'commonsense and nontechnical manner.'"  United States v. Hopkins, 220 F. App'x 155, 157 (3d Cir. 2007) (quoting United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000)).  While undergoing such a reading, a magistrate must determine "whether, based on the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place' . . . ." Id.  (quoting Hodge, 246 F.3d at 305); see also Jones, 994 F.2d at 1055 (holding that in situations where the search warrant is directed at a property, not a person, there must

be "probable cause to believe that instrumentalities or evidence of crime will be found."  (quoting United States v. Tehfe, 722 F.2d 1114, 1117 (3d Cir. 1983)).

"When the crime under investigation is drug distribution, a magistrate may find probable cause to search the target's residence even without direct evidence that contraband will be found there."  United States v. Stearn, 597 F.3d 540, 559 (3d Cir. 2010).  Indeed, the Third Circuit has long recognized that evidence associated with drug dealing "needs to be stored somewhere," and a drug dealer's dwelling is often "the best, and probably the only, location to store [such] items. . . ."  Whitner, 219 F.3d at 298; see also Hodge, 246 F.3d at 306 ("It is reasonable to infer that a person involved in drug dealing on such a scale would store evidence of that drug dealing at his home.").  The affidavit, however, must do more than suggest "only that the suspect 'is actually a drug dealer' and 'that the place to be searched is possessed by, or the domicile of the [suspect].'"  United States v. Williams, 974 F.3d 320, 351 (3d Cir. 2020) (quoting Burton, 288 F.3d at 104), pet. for cert. filed (Apr. 26, 2021.  Furthermore, the "search of a drug dealer's home would be unreasonable if the affidavit suggested no reason to believe contraband would be found there."  Stearn, 597 F.3d at 559.

In United States v. Burton, 288 F.3d 91 (3d Cir. 2002), the Third Circuit enumerated the proper test for assessing probable cause where an affidavit is "based on circumstantial evidence connecting the residence to an occupant's illegal activity, but not directly implicating the residence itself."  United States v. Castro, No. 15-cr-362, 2016 WL 492435, at *1, *4 (E.D. Pa. Feb. 9, 2016) (citing Burton).  Under Burton, application of the inference requires evidence supporting "three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities."  U.S. v. Burton, 288 F.3d 91, 104 (3d Cir. 2002).

Defendant does not dispute the existence of the first factor, but challenges the warrant's sufficiency regarding the second and third Burton elements.  As to the second Burton factor, Defendant cites to numerous other cases wherein the evidence connecting the alleged drug dealer and the specific property search involved multiple days of surveillance or searches of utility bills to connect a name with the residence.  Defendant contends that, by contrast here, no extended surveillance of the residence was ever done prior to the issuance of the warrant.  Accordingly, he avers that because the affidavit fails to meet the preliminary premise that 2139 Anchor Street was the domicile of the dealer, the issuing magistrate judge could not have found probable cause to search the residence.

Defendant's argument, however, disregards the fact that the second Burton prong focuses on whether the property was either the domicile of the drug dealer or "possessed by" the drug dealer.  To that end, evidence that the drug dealer entered and/or exited a residence in connection with a drug transaction satisfies this element.  See, e.g., United States v. Thornton, 559 F. App'x 176, 179–80 (3d Cir. 214) (finding sufficient evidence for probable cause to search a residence when police observed the defendant enter and exit the residence searched immediately before and after selling drugs on two separate occasions; United States v. Johnson, 187 F. Supp. 3d 548 (M.D. Pa. 2016) (finding probable cause where the defendant exited the subject proper prior to the third controlled drug sale and had been observed exiting the same residence on one separate occasion).

Like the above cases, there is sufficient evidence connecting the alleged drug dealer with the 2139 Anchor Street address.  During the first controlled buy on April 16, 2019, the transaction was carried out by a black male operating a Nissan Quest, which was later found parked in the vicinity of the Anchor Street property.  A search with the Bureau of Motor Vehicles revealed that the vehicle was registered to a Mark Chamberlain, albeit at a different address.

During the second controlled buy on April 18, 2019, the same black male completed a drug transaction with the confidential informant.  With officers following, this black male was seen walking on Anchor Street and then using his keys to open up the front door of the property located at 2139 Anchor Street.  Officers observed the same Nissan Quest that was involved in the first controlled buy parked in front of the 2139 Anchor Street location.  Such evidence provides a sufficient basis for the magistrate judge's finding that the 2139 Anchor Street property was, at minimum, "in the possession" of an alleged drug dealer.

With respect to the third <u>Burton</u> prong, the Third Circuit has suggested many factors that may help establish the required nexus between a defendant's drug-dealing activities and his home, including:  large-scale operations, a defendant's attempts to evade officers' questions about his address, the conclusions of experienced officers "regarding where evidence of a crime is likely to be found," the proximity of the defendant's residence to the location of criminal activity, probable cause to arrest the defendant on drug-related charges, and the tip of a "concerned citizen" that a specific stolen item would be found in the defendant's residence.  <u>U.S. v. Stearn</u>, 597 F.3d 540, 560 (3d Cir. 2010).  Although Defendant argues that not all of these factors support a finding of probable cause, it is well settled that these factors are neither requirements nor exhaustive.  <u>Id.</u>  "As with the standard probable cause inquiry, a magistrate's task is simply 'to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  <u>Id.</u> (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983)).

Here, several factors support the magistrate judge's findings of probable cause.  Primarily, Defendant was seen entering the subject property with a key immediately after conducting an illegal drug transaction, thus allowing the inference that proceeds of the drug transaction would be located therein.  "While [courts] generally accept the common sense proposition that drug dealers often keep

9

evidence of their transactions at home, . . . that inference is much stronger when the home is the first place a drug dealer proceeds following such a transaction."   Burton, 288 F.3d at 104; see also Stearn, 597 F.3d at 564 ("In addition, Joseph Doebley apparently slept at 4049 Higbee the evening after he collected proceeds from a drug sale, suggesting the possibility that he entered the residence with drugs or drug-sale proceeds on his person."); United States v. Smith, 352 F. App'x 709, 712 (3d Cir. 2009) (finding third prong of Burton satisfied because of the "proximity of [the defendant's] residence to his drug activities, and the fact that he shuttled back and forth between [the property] and the site of controlled buys and his own suspected sale of cocaine."); United States v. Majeed, No. 08-cr-186, 2009 WL 2393921, at *9 (E.D. Pa. Aug. 4, 2009) ("The fact that [the defendant] returned directly to these residences immediately after apparently engaging in trafficking-related activities lends credence to the troopers' belief that contraband was likely to be found at those residences.").

Moreover, the Third Circuit has recognized that an issuing judge "may give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found."   Whitner, 219 F.3d at 296.   Here, the affidavit of probable cause provided the following statement:

> P./O Bogan has been a POLICE OFFICER for over 29 years . . . and has been involved in numerous investigations where the persons selling Narcotics will drive around and make their deliveries to potential buyers to make it harder on Law Enforcement to track and follow them back to their residence where they may store additional narcotics, weapons, and proceeds from their Illegal sales of Narcotics. P/O Bogan's experience with the drug delivery service is that the persons selling the Narcotics give out their cell phone number to potential customer's [sic], these persons would then drive around and meet their potential buyers, to eliminate the constant flow of persons knocking on their front door, and not being obvious to Law enforcement or neighbors.  These persons will drive around all day making deliveries, also to avoid being followed by Law Enforcement.

(ECF No. 20-1.)

Considering all of the evidence set forth in the affidavit, the magistrate judge reasonably found probable cause to believe that evidence of drug trafficking would be found inside the subject property.  Accordingly, I will deny Defendant's Motion to Suppress on this ground.

### B.    Whether the Good Faith Exception Applies

The Government argues, in the alternative, that even if the magistrate judge lacked a sufficient basis for his probable cause determination, the "good faith" exception applies and thus precludes the "extreme sanction of exclusion."  United States v. Leon, 468 U.S. 897, 926 (1984).

The United States Supreme Court established the good faith exception to the exclusionary rule in United States v. Leon, supra.  Balancing the exclusionary remedy's "substantial costs" against its deterrent "benefits," the Court held that the exclusion of evidence was not justified where officers act in the "objectively reasonable belief that their conduct d[oes] not violate the Fourth Amendment."  Id. at 918.  Thus, "a court should not suppress evidence seized under a warrant's authority, even if that warrant is subsequently invalidated, unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'"  Stearn, 597 F.3d 540, 561 (3d Cir. 2010) (quotations omitted); see also United States v. Caesar, 2 F.4th 160, 169 (3d Cir. 2021).

A court must "examine the totality of the circumstances, 'consider[ing] not only any defects in the warrant but also the officer's conduct in obtaining and executing the warrant and what the officer knew or should have known.'"  Caesar, 2 F.4th at 170 (quoting United States v. Franz, 772 F.3d 134, 147 (3d Cir. 2014)).  Ordinarily, the "mere existence of a warrant . . . suffices to prove that an officer conducted a search in good faith," and eliminates the need for any deep inquiry into reasonableness.  Hodge, 246 F.3d at 308 (citations omitted).  "Indeed, we neither expect nor require police to perform complex legal analysis in the field, for they are untrained in the law and are often called to make 'hurried judgment[s].'"  Stearn, 597 F.3d at 561 (quotations omitted).

11

In "narrow circumstances," the good faith doctrine is not sufficient to override the warrant's lack of probable cause.   The Third Circuit has identified four such situations in which the good faith exception does not apply:

> (1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> (2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;
>
> (3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
>
> (4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

United States v. Tracey, 597 F.3d 140, 151 (3d Cir. 2010).   Although the most frequently litigated situation is the third, "[t]hese are the rare circumstances in which, although a neutral magistrate has found probable cause to search, a lay officer executing the warrant could not reasonably believe that the magistrate was correct."   Stearn, 597 F.3d at 561.

Here, Defendant contends that "any reasonable officer would have known that the affidavit should have included more that 2139 Anchor Street was the unidentified drug dealer's residence, and more information establishing a nexus between alleged drug activities and the residence." (Def.'s Mot. 14.)   Defendant presses that "[b]ecause the affidavit fails to establish that the dealer resided at 2139 Anchor Street or an objectively reasonable nexus between the criminal activity and 2139 Anchor Street, the good faith exception is inapplicable." (Id.)

Defendant's argument is flawed in two respects.   Primarily, Defendant attempts to relitigate a meritless probable cause argument.   As noted above, the affidavit identified Defendant as a suspect in two controlled drug buys, described Defendant's keyed entry into the subject property after one of the buys, and indicated that a vehicle registered to Defendant and used in one of the controlled

buys was parked outside of the subject property.  Based on those facts, a magistrate judge found that probable cause existed.  Defendant has identified no circumstances that would cause a reasonable lay officer executing the warrant to believe that he was acting unlawfully.

Moreover, the good faith exception allows consideration of the totality of the circumstances and what the officer knew or should have known at the time of execution of the warrant.  As set forth above, Officer Jeffrey Galazka testified that prior to the execution of the search warrant, he conducted another surveillance of the property wherein he observed Defendant exit the property of 2139 for a short period of time, and then again return to the property.  This observation, which directly linked Defendant to the subject property, confirmed for officers that the search warrant was appropriately directed to the 2139 Anchor Street property.

Based on all of these factors, I find that it was objectively reasonable for the officers involved in executing the search warrant to believe that the warrant was properly issued based on the attached affidavit and that they were entitled to rely on it when searching the subject property.  Accordingly, if the search warrant could be deemed deficient, I find that the good faith exception applies.

C.    **Whether the Affidavit in Support of the Search Warrant Contained False and Misleading Information**

In a later-filed supplement to the Motion to Suppress, Defendant also contends that the affidavit of probable cause in support of the search warrant contained false and misleading information upon which the Magistrate Judge had to rely in order to approve the search warrant. Specifically, Defendant identifies three alleged discrepancies/falsities in the affidavit and suggests that such discrepancies had a material impact on the probable cause determination.

In Franks v. Delaware, 438 U.S. 154, 15 (1978), the United States Supreme Court determined that a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant.  Id.  In order to overcome the general

presumption that an affidavit of probable cause supporting a search warrant is valid, a defendant must first "make a 'substantial preliminary showing' that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause." United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006) (quoting Franks, 438 U.S. at 171)).  If such a showing is made, then the court must conduct an evidentiary hearing—known as a Franks hearing—and "the defendant must ultimately prove by a preponderance of the evidence that: (1) . . . the affiant knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination." Id.

Notably, a defendant is not entitled to a Franks hearing absent a substantial preliminary showing that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth and which is material to the finding of probable cause.  United States v. Aviles, 938 F.3d 503, 508–09 (3d Cir. 2019).  Thus, the defendant must show "(1) that a warrant application contained false statements made with reckless disregard for the truth and (2) that the remaining truthful statements, standing alone, do not establish probable cause."  United States v. Desu, 23 F.4th 224, 234 (3d Cir. 2022).  To carry this burden, a defendant cannot "rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses.'"  Id. (quoting Yusuf, 461 F.3d 374, 383 n.8 (further quotations omitted)).  If a defendant fails to make this "substantial preliminary showing" sufficient to overcome the general presumption that an affidavit of probable cause supporting a search warrant is valid, the district court does not err in declining to hold a Franks hearing.  Yusuf, 461 F.3d at 383; see also United States v. Toney, 819 F. App'x 107, 110 (3d Cir. 2020).

"[N]egligence or innocent mistake" is insufficient to constitute reckless disregard for the truth. Id. In Wilson v. Russo, 212 F.3d 781, 787 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit set forth standards to identify what constitutes "reckless disregard for the ruth" regarding both misstatements and omissions:

> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

Id. at 783.

To prove materiality, *i.e.* that the deficiency in the affidavit was material to the original probable cause finding, there is a distinction between misrepresentations and omissions. When there is an affirmative misrepresentation, the court must "excise the false statement from the affidavit" and determine whether probable cause still exists. Id. at 384. When there is an omission, the court must remove the "falsehood created by an omission by supplying the omitted information to the original affidavit," and then determining probable cause. Id. (quotations omitted). "In the end, the defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit, i.e., that the deficiency in the affidavit was material to the original probable cause finding." Yusuf, 461 F.3d at 383.

Considering each of the alleged omissions identified by Defendant, I find that Defendant has not made a substantial preliminary showing either that Officer Bogan, as the affiant, knowingly or recklessly omitted information, or that the omitted information was material.

1.     Discrepancy Between the Affidavit and the Property Receipt

Defendant contends that the first controlled purchase as described in the affidavit of probable cause allegedly took place in the 15th Police District, which is in Northeast Philadelphia near

Plaintiff's home.  The police Property Receipt relating to the first controlled purchase, however, states that the drug transaction took place within the confines of the 16th Police District, which is in West Philadelphia.  That Property Receipt then has the 16th District control number crossed off and the 15th District control number handwritten over the top.  Defendant suggests that this discrepancy allows the inference that "property seized in another investigation has been 'transferred' to [Defendant's] case."  (Def.'s Suppl. Mot., ECF No. 43, at p. 2.)

Notably, Defendant neither challenges the fact that a controlled purchase did in fact occur in the 15th Police District nor suggests that a different controlled purchase on the same investigation occurred on the same day in the 16th Police District.  As such, this argument does not establish that Officer Bogan made any misstatement or omission in the affidavit of probable cause, let alone acted with the requisite reckless disregard for the truth.  Rather, it simply suggests that there may have been a typographical mistake in the police Property Receipt, a document not considered by the Magistrate Judge.  Moreover, given that there was a second controlled purchase that occurred near 2139 Anchor Street, which was Defendant's residence and the subject of the search warrant, any discrepancy as to the location of the first controlled purchase was immaterial to a finding of probable cause. [2]

2.    Failure to Obtain Defendant's Driver's License Picture

Defendant next asserts that after the police officers determined that the car used in the first controlled purchase was registered to Defendant, they failed to obtain Defendant's driver's license

---

[2]    At the suppression hearing, defense counsel argued, for the first time, that, on the Property Receipt, the property receipt number was also crossed out and a new number written in.  Counsel suggested that, from this receipt, the Court could infer that the narcotics field unit took drugs from another case against another defendant, which was dismissed and put them on this case to build up a story against Defendant and use it to pressure Defendant into giving police information about an unrelated homicide.  (N.T. 25:10–28:24.)  As I noted during the hearing, I find that this conspiracy theory is "too far afield" involving "unsubstantiated assumptions" and, as such, does not warrant a Franks hearing.  (N.T. 1/6/22, 29:12–15.)

photo to verify that Defendant was in fact the seller observed in the transaction.  Defendant suggests that an inference could be made that this fact was not included in the affidavit because he was not the seller on that date.

This second alleged "oddity" also does not constitute a substantial, preliminary showing of an intentional or reckless misstatement or omission material to the affidavit.  Primarily, Officer Bogan made no representation that, after the first controlled purchase, police had seen the alleged dealer's face or knew the alleged dealer's identity.  As such, Officer Bogan would have no basis to disclose the fact that the police had not checked Defendant's license picture to verify that he was the individual involved in that controlled purchase.  Moreover, any alleged omission regarding Defendant's identity was not material to the affidavit because the officers sought a search warrant for 2139 Anchor Street, not of Defendant's person.  As noted above, the officers had sufficient evidence to connect that address to the two controlled purchases.  Accordingly, I find no basis for a <u>Franks</u> hearing on this ground.

3.    <u>Knowledge of Defendant's Phone Number</u>

In his last identified discrepancy/omission, Defendant claims that members of the Philadelphia Police Department already knew Defendant's phone number prior to April 15, 2019—when the instant investigation began—because Defendant had been previously questioned by police in connection with a homicide occurring on April 11, 2019.  Defendant posits that "[i]t could be inferred that the information tip cited in the affidavit never occurred and that it is very likely that the number was given to the Narcotics Field Unit by the Homicide detectives."  (Def.'s Suppl. Mot., ECF No. 43, at p. 3.)

Such a speculative allegation does not constitute a substantial showing that the affidavit included either a materially false statement or a material omission.  Nothing in the affidavit suggests that the police officers only learned of Defendant's number during the first controlled purchase.

Indeed, the affidavit specifically notes that the officers received information from the Criminal Intelligence Unit that drugs were being sold around the area of Anchor and Torresdale using a cell phone number of 215-609-7495, which was possibly related to a recent homicide.  The fact that the officers knew Defendant's phone number from their previous questioning of him in connection with that homicide is of no relevance or materiality and not something Officer Bogan would have necessarily thought to include in the affidavit of probable cause.

In short, I find that Defendant has failed to make a substantial preliminary showing that the Affidavit contained a false statement or omission—made knowingly or with reckless disregard for the truth—which was material to the finding of probable cause.  In turn, Defendant has not overcome the general presumption that the Affidavit was valid.  Accordingly, I decline to hold a <u>Franks</u> hearing and will deny Defendant's Motion on the ground.

### D.      Whether Defendant's Statements Should Be Suppressed

Defendant's Motion also seeks to suppress statements he made during the execution of the search warrant on April 22, 2019.  Specifically, during the arrest, Defendant provided a statement regarding the location of contraband, *i.e.* a shotgun, in his house.  Defendant now contends that the statement was both coerced and the fruit of the illegal search of his residence.

#### 1.  Whether the Statement Was Voluntary

The Due Process Clauses of the Fifth and Fourteenth Amendments bar the use of incriminating statements that are involuntary.  <u>Lam v. Kelchner</u>, 304 F.3d 256, 264 (3d Cir. 2002). "The voluntariness standard is intended to ensure the reliability of incriminating statements and to deter improper police conduct."  <u>Id.</u> at 264 (citations omitted).  "The ultimate issue of voluntariness is a legal question requiring an independent federal determination."  <u>Id.</u>  The government has the burden of proving, by a preponderance of the evidence, that a statement was made voluntarily.  <u>See</u> <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972).

18

The United States Supreme Court has held that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." <u>Arizona v. Fulinante</u>, 499 U.S. 279, 288 (1991).  To determine whether a statement is voluntary, a reviewing court must consider "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." <u>Dickerson v. United States</u>, 530 U.S. 428, 434 (2000) (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)).  "These surrounding circumstances include 'not only the crucial element of police coercion . . .' but may also include 'the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health.'" <u>Lam</u>, 304 F.3d at 264 (quotations and citations omitted).

Defendant argues that his statement to police about the location was involuntary because a large group of police officers broke open his door and placed him under arrest.  After the arrest, Officers Bogan and DeVeaux searched Defendant and found illegal narcotics.  Defendant contends that these events created a "coercive atmosphere." (Def.'s Mot. 16.) Defendant asserts that "having been arrested in his home by a large team of police officers that had just forced his door open . . . and . . . the officer finding drugs on him, [Defendant] felt overwhelmed and compelled to admit incriminatory information.  Indeed, he felt he had no choice but to make a confession." (<u>Id.</u>)  At the hearing, Defendant also testified, for the first time, that his children were present and Officer Galazka threatened to get the Department of Human Services to take the kids if Defendant did not volunteer where the guns and drugs were kept.

Defendant's argument is meritless on two grounds.  It is well established that a suspect must be informed that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  But the Supreme Court has clarified that these "special procedural safeguards outlined in <u>Miranda</u> are required not where a suspect is

simply taken into custody, but rather where a suspect in custody is subject to interrogation." Rhode Island v. Innis, 446 U.S. 291, 300 (1980). "'Interrogation' occurs not only when the police subject a suspect to express questioning, but also results from 'words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.'" U.S. v. Frisby, 85 F. App'x 802, 804 (3d Cir. 2003) (emphasis in original) (quoting Innis, 446 U.S. at 302).

Here, although Defendant was being arrested and, thus, placed into custody, the record does not reflect that he was being interrogated at the time he told officers about the location of the gun in the house. While Defendant testified that the officers kept asking him were the guns and drugs were, Officer Galazka testified to the contrary, noting that neither he nor any other officer questioned Defendant about any contraband in the house. Having had the opportunity to observe both witnesses during the suppression hearing, I find that Officer Galazka's testimony was credible.

Second, courts have declined to find that a statement is involuntary simply because it was made during the course of arrest or the execution of a search warrant. See, e.g., Frisby, 85 F. App'x at 804 ("[A]lthough [defendant] was in custody at the time he revealed the location of the gun, he was not under police interrogation. [Defendant] himself asked to speak with Agent Roselli, questioned Roselli about what the agents were searching for, and then volunteered the location of the .380 gun to avoid having his home 'torn apart' in the search."); U.S. v. Fautz, 812 F. Supp. 2d 570, 644–45 (D.N.J. 2011) (finding statements spontaneous and voluntary despite the fact that defendant was a 65-year old man with a heart condition who had been roused from sleep by agents and a SWAT team bursting in with guns pointed and verbal shouting, handcuffed from behind, and placed in police transport vehicle where he made the statements in question); U.S. v. DeSumma, 44 F. Supp. 2d 700, 706 (E.D. Pa. 1999) (finding statement voluntary where, as defendant was being arrested and handcuffed and had been in custody only for a few minutes, officer asked defendant

whether he had any weapons, and defendant responded that he had a weapon inside his car), aff'd, 272 F.3d 176 (3d Cir.), cert denied 535 U.S. 176 (2001).

Here, by all accounts, Defendant volunteered the information contained within his statements.  During the Defendant's arrest, officers found a loaded revolver on Defendant's person, after which Defendant spontaneously stated that he had the gun for protection.  No questions were posed directly to Defendant and no conversation occurred between the officers designed to provoke a response from Defendant.  Defendant further volunteered that there was a shotgun in the rafters of the basement.  (Id. 36:12–16.)  Although Defendant claimed that Officer Galazka threatened to have the Department of Human Services remove Defendant's children from the home if Defendant did not volunteer the location of any guns or drugs, I do not find this testimony to be credible.  Indeed, I note that Officer Galazka explicitly testified that he made no such threat.  As such, aside from valid search and arrest, the record contains no evidence of any coercive circumstances that would render Defendant's statement involuntary.  Accordingly, I conclude that the statement need not be suppressed as involuntary.

2.    Whether the Statements Are the "Fruit of the Poisonous Tree"

Alternatively, Defendant seeks to suppress his statements as the fruit of an unlawful search. The so-called "fruit of the poisonous tree" doctrine is an exclusionary rule that dictates that evidence obtained from a constitutional violation or constitutionally improper search must be suppressed. See Wong Sun v. United States, 371 U.S. 471. 484–85 (1963).  As set forth above, however, the search warrant and, in turn, the subsequent search and arrest were substantiated by probable cause. As such, this exclusionary rule does not apply.

IV.    CONCLUSION

For all of the foregoing reasons, I will deny Defendant's Motion to Suppress in its entirety. An appropriate Order follows.